## Yeager v. Mengal Co.

(Decided June 18, 1935.)

HUBBARD BROTHERS for appellant.

CRAWFORD, MIDDLETON, MILNER & SEELBACH and DON-ALD DINNING for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

This suit was originally instituted by the appellant before the Workmen's Compensation Board for compensation for the death of her son, James J. Sheffield, who was employed by the appellee company. It is admitted that Sheffield was working under the provisions of the Workmen's Compensation Act (Ky. Stats. sec. 4880 et seq.).

It is claimed by appellant that the death of her son resulted from an injury received by him on July 18, 1929, while at work in the course of his employment.

The case was heard by the board, and it found Sheffield's death not to be a result of an injury sustained in connection with his employment, and entered an order accordingly. Appellant appealed the case to the circuit court, and the court sustained the finding of the board, whereupon an appeal was taken to this court, and the case was reversed on the ground that the board's finding of fact was insufficient or not in compliance with the statute. 242 Ky. 543, 46 S. W. (2d) 1076. Upon a return of the case, the board reviewed the evidence and again found in favor of appellee, the defendant below, and from which order another appeal was prosecuted to the circuit court, and the court again sustained the finding of the board; hence this appeal.

The single issue presented on this appeal is the

sufficiency of the evidence. It is the contention of appellant that there is no evidence tending to sustain the finding of the board.

It is the contention of appellant that Sheffield was struck on the head or behind the ear by a block of wood thrown from and by the machine upon which he was working, and that the injury thus received resulted in an infection, which resulted in the death of her son. Two witnesses, Joseph Ambrose and Paul Bryant, who were also employees of appellee and working within a few feet of Sheffield at the time of the alleged accident, testified that the machine on which Sheffield was working would throw blocks, and when it threw blocks it would "sing"; that they heard the machine sing and they looked and saw Sheffield holding his hand on the back of his head. They approached him and inquired of him what was the matter, and he said he was struck on the head by a block thrown from the machine. Jack Hockersmith testified that he was working at the mill across on the opposite side from where Sheffield was working at the time he received the alleged injury, and Sheffield passed him on his way to get water, holding his hand up to his head, and said a block hit him. The appellant testified that when her son returned home from work on that day he complained about receiving a blow behind the ear, and she examined the place and found a bruise about an inch long and about one-fourth inch wide, with a hole in the flesh at the lower corner of the bruise about the size of a pencil point. However, Sheffield continued at his work for a few days after the alleged accident, but complaining that his head hurt, the foreman at the plant where he was working sent him to the first aid room, where he was treated by a nurse who described the wound as being "just a little bit red," and directed Sheffield to see a doctor if the place did not get better. On July 29, 1929, which was about 11 days after the alleged injury, Sheffield went to Dr. Cook's office for treatment. Dr. Cook testified that there was a swelling back of Sheffield's right ear with inflammation extending above the ear possibly about three inches in length, in the form of an abscess or boil, which the doctor lanced and drained, and asked Sheffield to come back the following day. Sheffield did not return as directed by the doctor, but on the 31st day of July the doctor was called to Sheffield's home

where he found him in a very serious condition. The doctor testified that Sheffield gave him the history of the case for the purpose of treatment; stating that while he was at work he was struck back of the ear by a splinter and the force of it was so great that it nearly knocked him down, and that he, Sheffield, later extracted the splinter that went to his skull. The doctor was asked:

"Would you say from your examination of this boy and from the history of the case, that his condition was caused from this traumatic injury back of his ear? A. I would."

Dr. Purvis was called as a witness for the plaintiff, and testified that he treated Sheffield after he was removed from his home to the City Hospital, and found him to be suffering from cellulitis followed by septic complications, pneumonia, and that the immediate cause of his death was septicemia, blood poison. The doctor was asked and answered as follows:

"Q. Did he give you a history of this case, or did you take the history he had given some one else? A. He talked to me personally; he said he had a small pimple back of his ear, which was squeezed by a nurse and opened by a private doctor in town, and he began to feel worse.

"Q. He had a small pimple squeezed by a nurse and it was opened by a doctor out in town? A. Yes.

"Q. He did not tell you he did or did not get a lick behind his ear? A. No.

"Q. That was not mentioned? A. No. * * *

"Q. I will ask you if a splinter penetrated this place, it could have caused such a condition as you have described and infection set in? A. A splinter could cause infection.

"Q. Would it make the place appear as the one you have described? A. I suppose it would be possible. I have seen splinter wounds, but I never saw one identically like this one.

"Q. It would be possible? A. Yes, although I have never seen one."

Dr. Duffery Hancock, who testified for the defendant, stated that he treated Sheffield and talked to him about his injury and checked the history taken by Dr. Purvis. He was asked and answered as follows:

"Q. What history did the boy give you? A. He said about a week or so before, he had a pimple back of his ear; that it had been opened and after that the tissue about it began to swell and hurt and an incision was made several days after that and several days before he came in the hospital; that even after the incision was made, the swelling still persisted.

"Q. Did he give you a history of any accident? A. No.

"Q. Did you make an examination of him at that time? A. Yes.

"Q. What did you find his condition to be? A. You mean local or general?

"Q. Local. A. At the hair line back of the right ear, he had a small pimple or furuncle or boil which evidently had been opened or drained of its own accord; about an inch below that there was an incision that had evidently been made by a doctor, and the tissue extending from the pimple through this incision and further down the side of the neck was red and swollen.

"Q. Did you observe any evidence of accident or traumatic injury? A. No.

"Q. Did or not this pimple have the characteristic resemblance of a pimple that arises more or less of its own accord? A. It seemed to have the appearance of an ordinary pimple on the hair line. * * *

"Q. I understand from you that the furuncle was not in any way connected with this incision? A. I think it was the original cause of his trouble."

Louis Kurburg, personnel director at appellee's mill testified that he had a conversation with appellant's witness Hockersmith three or four weeks after Sheffield's death, and that Hockersmith told him that Sheffield's mother at first thought Sheffield had been hit in

the back of the head, but had changed her mind, and now thought he had died from a boil. He further stated that Hockersmith told him that he knew nothing of Sheffield's being hit. Appellant's witness Ambrose also admits that he made no report to any one of the information which he had as to Sheffield claiming to have received an injury, until about the time the case was called for trial a year later. Appellant's witness Bryant makes the same admission. And it is further shown that when the boss told Bryant that Sheffield was dead, Bryant did not tell the boss that he knew anything about the claim that an accident had occurred, and no mention was made of it to any one until a few days before the trial, which was about 14 months after the happening of the alleged accident.

At the conclusion of the evidence, the board entered the following order:

"We have carefully reconsidered the evidence in this case upon the question whether the death of deceased resulted from this alleged injury, and upon such reconsideration have reached the conclusion that the death of the deceased did not result from the injury as claimed by the plaintiff, but resulted from a pimple or rising or boil, as contended by the defendant."

In view of the testimony of Dr. Purvis and Dr. Hancock, and the further fact that appellant's other witnesses were at least circumstantially contradicted, we are unable to say that there is no evidence tending to support the finding of the board, even though it may be conceded that the preponderance of the evidence is to the contrary.

In the case of Madden v. Black Mountain Corporation, 238 Ky. 53, 36 S. W. (2d) 848, 850, we said:

"It takes less evidence to sustain the finding of the board than is required to sustain a verdict of the jury. There is no reason why the scintilla rule should not be applied by the board, the same as it is by the courts, in cases tried by a jury of the vicinage. The only question on an appeal in such cases to be determined by us is, is there any competent evidence upon which an award might be based? It is not our province to weigh the evidence

162

heard by the board and determine the issues according to a preponderance of the evidence.''

See, also, Andrews Steel Co. v. McDermott, 192 Ky. 679, 234 S. W. 275, wherein it was held that although there was a preponderance of proof in favor of the plaintiff's contention, there was proof in the record which supports a contrary view, and the court is not authorized to interfere with the board's finding of fact. This well-settled rule that the courts may not interfere with an award of the Workmen's Compensation Board on a disputed question of fact or where there is any conflict in the evidence, is just as applicable where the decision is adverse to the employee as to the employer. Ky. & W. Va. Power Co. v. Terry, 238 Ky. 187, 37 S. W. (2d) 36.

It is the purpose and intent of the statute and all decisions of this court thereunder, that the board can reject the theory of the case of either side and be controlled by the evidence or theory of the other side, even though the testimony is meager or merely of a negative character, provided such evidence is of any probative value or character having the effect of proof, and the findings of the board thereunder are conclusive, unless there is an entire absence of evidence to support them.

Having concluded there is some evidence conducing to support the finding of the board, it follows that we are unauthorized to disturb it.

The judgment is affirmed.